**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THOMAS CALDWELL,<br>*Address Filed Under Seal*<br>Plaintiff,<br><br>-against-<br><br>UNITED STATES OF AMERICA,<br>*c/o U.S. Attorney's Office, District of Columbia*<br>*950 Pennsylvania Avenue, NW Washington, DC, 20530*<br><br>MERRICK GARLAND, individually,<br>*c/o Arnold & Porter 601 Massachusetts Ave,*<br>*NW Washington, DC 20001*<br><br>MATTHEW GRAVES, individually,<br>*c/o Winston Taylor LLP, 1901 L Street NW*<br>*Washington, DC 20036*<br><br>JOHN DOES 1-25, individually,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff THOMAS CALDWELL (hereinafter, "Plaintiff" or "Caldwell") by and through his attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was targeted, arrested, prosecuted, and punished because of his constitutionally protected expressive and associational activity as a member not just of the protesters who gathered on Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January 6th Defendants") but also as because of his perceived association with and leadership of a political organization that the Government sought to penalize and make an example of, namely, the Oath Keepers. Defendants sought to make an example of Plaintiff as someone who could be portrayed as the leader of an entire movement. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(e) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the District of Columbia.

8. On or about August 10, 2025, Plaintiff transmitted an administrative Notice of Claim to the United States Department of Justice ("DOJ") and the United States Bureau of Prisons ("BOP") setting forth the factual basis for his claims and demanding a sum certain. More than six months elapsed without final denial.

9. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

10. Plaintiff is a United States citizen and resident of Highlands County, State of Florida.

11. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

12. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

13. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

14. Defendants JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## FACTUAL ALLEGATIONS

15. Thomas Caldwell is a 100% service-connected disabled Navy veteran who, at the time of the events giving rise to this action, was sixty-six years old and was living with severe, permanent physical disabilities and subsequent medical complications resulting from years of military service in the United States Navy. Before his arrest, Caldwell depended upon an extensive regimen of prescription medications simply to remain ambulatory and manage chronic neck and back pain. Before January 6th, 2021, Plaintiff had never been arrested and had lived an exemplary and law-abiding life.

16. On January 6th, 2021, a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

17. On that day, Caldwell traveled to Washington, D.C., with his wife to attend the events surrounding the certification of the Electoral College vote. Despite his age and significant physical disabilities, he made his way toward the Capitol along with thousands of other demonstrators.

18. Plaintiff never entered or tried to enter the Capitol building. Plaintiff spent most of the day outside of the Capitol grounds, at and around an area known as the Peace Fountain.

19. Plaintiff was unarmed and did not assault any law enforcement officers or damage any property.

20. Indeed, Plaintiff's most aggressive actions that day were his inflammatory private messages describing the day's events. However, these messages, while shocking in tone and substance, are emblematic of Plaintiff's penchant for exaggerating his own exploits and using coarse, hyperbolic language. The Government's broader portrayal rested heavily on boastful and inflammatory post-event statements that often overstated what video and photographic evidence showed him actually doing.

21. Plaintiff was arrested on January 19, 2021.

22. The criminal action proceeded in the United States District Court, District of Columbia, under Case No. 21-cr-28. In January 2022, Plaintiff and several of his co-defendants were re-arraigned under Case No. 22-cr-15.

23. A final superseding indictment was entered on June 22, 2022. Plaintiff was charged with violating:

a. 18 U.S.C. § 2384: Seditious Conspiracy;

b. 18 U.S.C. § 1512(k): Conspiracy to Obstruct an Official Proceeding;

c. 18 U.S.C. §§ 1512(c)(2): Obstruction of an Official Proceeding and Aiding and Abetting;

d. 18 U.S.C. § 372: Conspiracy to Prevent an Officer from Discharging Any Duties; and

e. 18 U.S.C. § 1512(c)(1): Tampering with Documents or Proceedings.

24. Notably, Plaintiff was charged with violating 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding.

25. While awaiting trial, Plaintiff was denied bond and detained at the Central Virginia Regional Jail in Orange, Virginia because the United States argued that Plaintiff was a member of the Oath Keepers, an extremist and violent militia group, as will be further set forth below.

**THE GOVERNMENT'S FALSE AND MISLEADING PORTRAYAL OF PLAINTIFF AS A LEADER OF AN EXTREMIST GROUP**

26. From the inception of its investigation, the Government sought to portray Plaintiff as a senior member, and even a leader, of the Oath Keepers organization, which the Government publicly described as members of a paramilitary organization and participants in a conspiracy to oppose by force the lawful transfer of presidential power. In support of the criminal complaint, the Federal Bureau of Investigation represented that Plaintiff was "believed to have a leadership role within the Oath Keepers" and alleged that he had coordinated with other Oath Keepers in planning the events of January 6, 2021. Those allegations became the cornerstone of the Government's theory of the case and formed the basis upon which Plaintiff was publicly portrayed as one of the principal architects of the events of January 6th.

27. That portrayal had immediate and lasting consequences. After his arrest on January 19, 2021, Plaintiff was charged with numerous serious felony offenses, including multiple conspiracy counts that alleged he had joined with members of the Oath Keepers to oppose the lawful transfer of presidential power by force. Rather than being treated as an individual defendant whose conduct could be evaluated on its own merits, Plaintiff was prosecuted as part of the Government's sweeping Oath Keepers conspiracy case and was tried alongside nationally known Oath Keepers defendants whose alleged conduct and organizational roles were substantially different from his own. Throughout the prosecution, the Government repeatedly sought to tie

Plaintiff to the Oath Keepers organization and its leadership, thereby associating him with the organization's broader objectives and the actions of its members.

28. The Government's characterization of Plaintiff also materially affected the conditions under which he was detained. Following his arrest, Plaintiff spent fifty-three days incarcerated at the Central Virginia Regional Jail. Approximately forty-nine of those days were spent in medical segregation or solitary confinement. Jail officials regarded Plaintiff as an exceptionally dangerous inmate because of the Government's repeated allegations that he had orchestrated the January 6th attack and held a leadership role within the Oath Keepers organization.

29. While confined, Plaintiff, who was sixty-six-years-old and 100% disabled due to his honorable Navy service, was deprived of most of the prescription medications which he relied upon to control debilitating pain, chronic migraine headaches, hypertension, and other serious medical conditions. Despite the fact that Plaintiff's opioid medication had been prescribed for years by pain management specialists to treat chronic service-connected injuries, jail medical personnel immediately classified Plaintiff as being on an "opiate withdrawal protocol" and discontinued or withheld the overwhelming majority of his prescribed medications. Plaintiff's primary pain medication, Oxymorphone (Opana), was withheld entirely. He was likewise denied Lunesta, which enabled him to sleep despite chronic pain; Relpax, which had been prescribed to treat severe migraine headaches; Vyvanse; and other medications upon which he routinely depended. Instead, Plaintiff was provided aspirin, Advil, and other over-the-counter medications that proved ineffective in controlling either his chronic pain or recurring migraine headaches.

30. The abrupt discontinuation of Plaintiff's long-standing medication regimen caused profound physical suffering. Plaintiff was forced to endure an involuntary withdrawal from

medications that had been carefully prescribed and monitored by his treating physicians over many years, without consultation with those physicians and without an individualized assessment of his medical needs. Plaintiff repeatedly complained of severe pain and debilitating migraine headaches, including one migraine lasting several days after his prescribed migraine medication was denied.

31. Plaintiff's confinement conditions further exacerbated his deteriorating physical condition. During the forty-nine days when Plaintiff was in medical segregation or in the jail's Segregated Housing Unit, Plaintiff was frequently wheelchair-bound because of his chronic orthopedic conditions and was observed by counsel in obvious physical distress. Plaintiff appeared shackled, confined to a wheelchair, and writhing in pain during attorney visits and court appearances.

32. These unusually restrictive conditions were not imposed because of any misconduct while incarcerated, but because federal authorities had portrayed him as an exceptionally dangerous January 6th Defendant and a leader within the Oath Keepers organization. Jail officials relied upon those characterizations in maintaining Plaintiff under maximum-security conditions despite his advanced age, profound physical disabilities, and limited mobility. As a consequence, Plaintiff spent nearly his entire period of pretrial detention isolated from the general population while simultaneously deprived of the medical treatment that had allowed him to function prior to his arrest.

33. The Government's decision to characterize Plaintiff as an Oath Keepers leader and conspirator also dictated the manner in which he was prosecuted. Rather than proceeding as an individual defendant, Plaintiff was joined in the Government's flagship Oath Keepers prosecution and tried alongside prominent members and leaders of the organization. As a consequence of the Government's conspiracy theory, Plaintiff faced not only obstruction and related offenses but also

some of the most serious charges arising out of January 6, including seditious conspiracy under 18 U.S.C. § 2384, a charge carrying a statutory maximum sentence of twenty years' imprisonment and reserved for allegations that defendants conspired to use force against the authority of the United States. Throughout pretrial proceedings and trial, Plaintiff was necessarily associated in the public eye with nationally publicized allegations concerning the Oath Keepers organization and its leadership.

34. As the case progressed through discovery and trial, however, the Government's original portrayal proved increasingly difficult to sustain. The Government established association and communication with Oath Keepers members, but it did not establish that Caldwell was formally a member, held organizational office, participated in Oath Keepers leadership chats, or joined any of the charged criminal agreements. Indeed, by the time of sentencing, the Government had significantly retreated from its earlier characterization of Plaintiff as an Oath Keepers leader, instead describing him as someone who had "plotted with other affiliates of the Oath Keepers," a materially different characterization from the allegations that launched the prosecution.

35. Most importantly, after hearing weeks of testimony and considering hundreds of exhibits, the jury rejected the central premise that Plaintiff had knowingly joined the charged Oath Keepers conspiracies. Plaintiff was acquitted of every conspiracy count alleged against him. Those acquittals reflected the jury's rejection of the Government's contention that Plaintiff knowingly entered into the criminal agreements that formed the heart of the prosecution's original theory. Although Plaintiff was convicted of obstruction-related offenses, following the Supreme Court's decision in *United States v. Fischer* the district court entered a judgment of acquittal and dismissed the charge. By the conclusion of the criminal proceedings, the only conviction that remained concerned Plaintiff's post-January 6th deletion of Facebook messages and photographs.

36. On January 10, 2025, Plaintiff was sentenced to time served with no supervised release. This sentence reflected the understanding that Plaintiff's pretrial detention had been especially severe, that Plaintiff's physical condition was especially poor, and that the Government simply was not able to satisfy its burden of proof to establish that Plaintiff was the leader of, or even a significant part of, a violent conspiracy to overthrow the government.

37. On January 20, 2025, President Trump commuted Caldwell's sentence.

38. On March 20, 2025, President Trump subsequently granted Plaintiff a full Presidential pardon for his sole remaining conviction under 18 U.S.C. § 1512(c)(1).

## THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN

39. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

40. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

41. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

42. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

43. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6th Defendants, including Plaintiff.

44. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

45. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

46. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**
*Fifth Amendment Equal Protection* – Bivens
*Federal Individual Defendants*

47. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

48. Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice

policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

49. Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512(c)(2), aggressive detention positions, enhanced charging decisions, and litigation strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

50. Plaintiff alleges that the DOJ Defendants intentionally subjected January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

51. Defendants intentionally singled out leaders of nationally recognized organizations, including the Oath Keepers and Proud Boys, for materially harsher investigative tactics, charging decisions, detention advocacy, and sentencing recommendations because prosecuting organizational leaders advanced Defendants' broader enforcement objectives.

52. Defendants intentionally singled out Plaintiff because of his wrongfully perceived membership in the Oath Keepers for materially harsher investigative tactics, charging decisions, detention advocacy, and sentencing recommendations because prosecuting organizational leaders advanced Defendants' broader enforcement objectives.

53. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

54. No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked a rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

55. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

**AS AND FOR A SECOND CAUSE OF ACTION**

*First Amendment Retaliation and Viewpoint Discrimination* – Bivens
*Federal Individual Defendants*

56. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

57. At all relevant times, Plaintiff engaged in activity protected by the First Amendment, including participating in political speech, attending a political demonstration, expressing political viewpoints concerning the 2020 Presidential Election, and associating with political organizations and individuals, namely members of the Oath Keepers.

58. Plaintiff's mere perceived membership in, or association with, members of the Oath Keepers could not, standing alone, lawfully justify materially different investigative, charging, prosecutorial, or sentencing treatment.

59. Defendants Garland, Graves, and the John Doe Defendants (the "DOJ Defendants"), acting personally and through policies they approved, implemented, supervised, or knowingly permitted, intentionally subjected Plaintiff to materially harsher investigative, charging, prosecutorial, and sentencing practices because of his actual or perceived political viewpoints, expressive activity, and organizational associations.

60. Upon information and belief, DOJ Defendants deliberately emphasized Plaintiff's perceived association with the Oath Keepers in investigative materials, charging decisions,

litigation strategy, plea negotiations, sentencing advocacy, and public messaging in order to portray Plaintiff as representative of a broader political movement rather than as an individual criminal defendant.

61. Plaintiff's alleged association with the Oath Keepers caused Plaintiff to be classified as extremely dangerous and to be detained pretrial in segregated housing in a maximum security facility even though he was almost sixty-six-years-old, 100% disabled, and had severe orthopedic injuries that caused him significant pain and required extensive medication.

62. Plaintiff's excessively restrictive pretrial detention, all of which occurred during a time when Plaintiff should have been presumed innocent of any crimes, caused significant physical and psychological injuries.

63. Defendants further employed the expansive interpretation of 18 U.S.C. § 1512(c)(2), together with enhanced charging practices and litigation strategies, to increase Plaintiff's detention exposure, sentencing exposure, public stigma, collateral consequences, and plea-bargaining pressure.

64. The Government's repeated public statements describing January 6 prosecutions as a principal enforcement priority, together with its emphasis upon deterrence and public example-making, demonstrate that DOJ Defendants intended not merely to prosecute alleged criminal conduct, but also to discourage similarly situated individuals from engaging in comparable political expression and association.

65. No legitimate governmental interest justified imposing materially different investigative, charging, and prosecutorial treatment upon Plaintiff because of his protected speech, expressive conduct, political viewpoints, or organizational associations.

66. DOJ Defendants' actions would deter a person of ordinary firmness from engaging in protected political speech, assembly, petitioning activity, or association out of fear of being subjected to disproportionately severe governmental investigation or prosecution.

67. As a direct and proximate result of DOJ Defendants' unconstitutional conduct, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, loss of professional opportunities, and other compensable damages.

68. Accordingly, Plaintiff is entitled to recover compensatory damages and, as against the individual Defendants, punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION

*Malicious Prosecution - FTCA*

69. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

70. This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

71. Acting through federal investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States caused criminal proceedings to be initiated and continued against Plaintiff under 18 U.S.C. § 1512(c)(2) in *United States v. Caldwell*, No. 21-cr-28 (D.D.C.).

72. The conduct giving rise to this claim includes the investigation, presentation, and continued pursuit of several conspiracy charges against Plaintiff, separate and apart from any other criminal charges asserted against him.

73. At all relevant times, federal officials knew or should have known that there was no probable cause for the conspiracy charges against Plaintiff because he was not a member of the Oath Keepers and did not conspire with them.

74. The absence of formal membership was significant because the Government repeatedly used alleged organizational leadership as a factual bridge to infer Caldwell's participation in criminal agreements, despite contrary evidence concerning his organizational status and communications.

75. Despite the lack of probable cause, which became more apparent as the factual record developed, federal officials continued pursuing the conspiracy charges against Plaintiff through pretrial proceedings and trial.

76. At all relevant times, federal officials knew or should have known that substantial legal questions existed regarding the scope and applicability of 18 U.S.C. § 1512(c)(2) to the conduct alleged against Plaintiff.

77. Despite those substantial legal deficiencies, federal officials continued pursuing the § 1512(c)(2) charge against Plaintiff through pretrial proceedings.

78. Upon information and belief, federal officials intentionally pursued the § 1512(c)(2) charge despite serious doubts concerning whether Plaintiff's alleged conduct fell within the proper scope of the statute.

79. Plaintiff alleges that the § 1512(c)(2) charge was pursued without probable cause because the conduct attributed to Plaintiff did not satisfy the essential elements ultimately recognized by the Supreme Court of the United States in *Fischer v. United States*.

80. Plaintiff further alleges that federal officials acted with malice and for improper purposes, including the desire to secure enhanced detention, increased sentencing exposure, and increased leverage against Plaintiff beyond that otherwise available under the remaining charges.

81. Defendants acted with malice by pursuing Plaintiff's prosecution for purposes extending beyond the fair enforcement of criminal law. Upon information and belief, Defendants

intentionally emphasized Plaintiff's alleged membership in the Oath Keepers because prosecuting a prominent organizational leader advanced the Government's broader objective of publicly demonstrating its campaign against organized January 6 groups. Plaintiff's organizational affiliation materially influenced investigative decisions, charging decisions, detention advocacy, and sentencing recommendations independent of the evidence relating to Plaintiff's individual conduct.

82. On November 29, 2022, the charges of18 U.S.C. § 2384: Seditious Conspiracy; 18 U.S.C. § 1512(k): Conspiracy to Obstruct an Official Proceeding; and 18 U.S.C. § 372: Conspiracy to Prevent an Officer from Discharging Any Duties terminated in Plaintiff's favor when a jury found him not guilty of those charges.

83. On June 28, 2024, the Supreme Court issued its decision in *Fischer v. United States*, substantially narrowing the scope of 18 U.S.C. § 1512(c)(2).

84. Following the Supreme Court's decision in *Fischer*, Plaintiff's conviction under 18 U.S.C. § 1512(c)(2) was vacated by the District Court judge on January 10, 2025.

85. The foregoing malicious prosecution of Plaintiff proximately caused Plaintiff to be unnecessarily detained in excessively harsh conditions, causing physical injury, emotional distress, reputational harm, and economic damages, thereby injuring Plaintiff.

## AS AND FOR A FOURTH CAUSE OF ACTION

*Abuse of Process – FTCA*

86. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

87. This claim is asserted solely against Defendant United States of America (the "United States") pursuant to the Federal Tort Claims Act.

88. Acting through its investigative and law-enforcement personnel acting within the scope of their employment, the Unites States employed and continued criminal process against Plaintiff for purposes beyond the legitimate adjudication of criminal liability.

89. Upon information and belief, federal officials used criminal process, including characterizing Plaintiff as a member and leader of the Oath Keepers and including the continued pursuit of charges under 18 U.S.C. § 1512(c)(2), to obtain collateral objectives unrelated to the proper purpose of criminal proceedings, including increasing Plaintiff's detention exposure, sentencing exposure, litigation burdens, and public stigmatization, and maximizing the deterrent effect of January 6th prosecutions.

90. Federal officials continued utilizing such process despite tenuous factual basis to allege Plaintiff's association with the Oath Keepers and substantial legal challenges to the Government's interpretation of 18 U.S.C. § 1512(c)(2) and despite knowing that the challenged charge materially increased prosecutorial leverage and the consequences faced by Plaintiff.

91. As fully set forth above and incorporated herein, throughout Plaintiff's prosecution Defendants relied on a tenuous connection between Plaintiff and the Oath Keepers to portray Plaintiff as a violent extremist who warranted excessive and restrictive pretrial detention.

92. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

93. Upon information and belief, federal officials used and maintained criminal process not solely to adjudicate Plaintiff's alleged criminal liability, but also to increase leverage over Plaintiff and similarly situated January 6th Defendants and to create public deterrence through the use of enhanced criminal charges.

94. Defendants used otherwise lawful criminal process for the collateral purpose of transforming Plaintiff's prosecution into a public demonstration of the Government's campaign against the Oath Keepers organization. Rather than limiting the prosecution to adjudicating Plaintiff's alleged conduct, Defendants repeatedly emphasized Plaintiff's organizational leadership to maximize the expressive, deterrent, and political significance of the prosecution.

95. The acts described herein constituted a willful misuse of criminal process for purposes other than those for which such process was designed.

96. As a direct and proximate result of the United States's abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, litigation expenses, and other damages.

97. Defendant United States is liable for those injuries pursuant to the Federal Tort Claims Act.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress - FTCA*

98. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

99. Defendant the United States, by and through its employees and agents, engaged in extreme and outrageous conduct, including labeling Plaintiff a domestic terrorist based on a tenuous association with members of the Oath Keepers, portraying Plaintiff, a sixty-six-year-old disabled veteran with significant orthopedic injuries, as a violent extremist. This characterization caused Plaintiff to be detained pretrial in segregating housing in a maximum-security setting,

essentially solitary confinement-like conditions, in which Plaintiff was denied his medication and caused severe physical and emotional damage.

100. Defendant the U.S. Government, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

101. The foregoing conduct was the proximate cause of Plaintiff's injuries.

102. As a result of the afore-described conduct, Plaintiff suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of additional permanent disability or death.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: September 29, 2026

Respectfully submitted,

/s/Alexander Lonstein
Alexander Lonstein
RAISER, KENNIFF & LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law